IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

PHILLIP MESSICK,                          *
                                          *
      Plaintiff,                          *
                                          *
v.                                        *        CV 322-021
                                          *
ROGER BRYANT, in his individual           *
capacity as Alamo Chief of Police;        *
JOHNNY L. SMITH, in his individual        *
capacity as Deputy for Wheeler            *
County; CLARK SCHRADER, in his            *
individual capacity as Officer for        *
the Dublin Police Department; and         *
TIM CHATMAN, in his individual            *
capacity as Dublin Chief of Police,       *
                                          *
      Defendants.                         *

---

O R D E R

---

Plaintiff Phillip Messick brought this action against various

law enforcement officials arising out of his encounter with them

on March 8, 2020.  Defendants Roger Bryant, Tim Chatham, and Clark

Schrader filed a motion for summary judgment on June 13, 2023.

That same day, Defendant Johnny L. Smith also filed a motion for

summary judgment.  The Clerk gave Plaintiff notice of the summary

judgment motions and the summary judgment rules, of the right to

file affidavits or other materials in opposition, and of the

consequences of default.  (Doc. Nos. 39 & 42.)  Therefore, the

notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825

(11th Cir. 1985) (per curiam), are satisfied.   Plaintiff filed a brief in opposition to the motion on August 2, 2023, and Defendants have filed reply briefs.   Upon consideration of the parties' briefs, the record evidence, and the relevant law, the motions for summary judgment must be granted for the reasons that follow.


## I.   FACTUAL BACKGROUND

Plaintiff Phillip Messick is a veteran who suffers from PTSD, depression, anxiety, and panic attacks.   (Pl.'s Resp. to Def. Smith's St. of Material Facts, Doc. No. 50-1, ¶ 1.[1])   At approximately 3:00 a.m. on the morning of March 8, 2020, Plaintiff woke up feeling as though he was having a heart attack.   (Id. ¶ 4.)   Plaintiff's girlfriend called 911 and was told that it would be 10 to 15 minutes for an ambulance to arrive, so Plaintiff decided to drive himself to the hospital.   (Id. ¶ 5.)

Defendant Roger Bryant, Chief of Police for the City of Alamo, responded to the 911 call and drove toward Plaintiff's residence in a Chevrolet Patrol Tahoe ("SUV").   (Pl.'s Resp. to Def. Bryant's St. of Material Facts, Doc. No. 50-2, ¶¶ 6-7.[2])

---

[1] The Court will refer to this document hereinafter as "Def. Smith's Undisputed Facts."

[2] The Court will refer to this document hereinafter as "Def. Bryant's Undisputed Facts."

Chief Bryant informed EMS that he knew Plaintiff and would try to calm him down. (Id. ¶ 8.)

Defendants have submitted into evidence the dashboard camera recording in Chief Bryant's SUV. The "dash cam" recorded events from 3:26 a.m. to 5:09 a.m. (See Doc. No. 41-2.) Defendants acknowledge that "very little" may be seen on the dash cam since the critical events happened on the side of Chief Bryant's vehicle. (See Doc. No. 37-1, at 4.) Nevertheless, the audio portion of the recording is functional and informative; so much so that to the extent any statement or testimony is contradicted by the audio from the dash cam, the Court will accept the audio as definitive. See Scott v. Harris, 550 U.S. 372, 378-81 (2007) (announcing that a court should not rely upon a "visible fiction," i.e., a version of events "utterly discredited" by a videotape; rather, a court should view the facts "in the light depicted by the videotape"). In truth, between the verifiable facts set forth by Defendants, Plaintiff's deposition testimony, and the video/audio evidence, there are very few disputed facts in this case – and none that are material to the summary judgment issues.

The dash cam reveals the following. As Chief Bryant approaches Plaintiff's vehicle head-on in Plaintiff's neighborhood at 3:26:42 a.m., Plaintiff yells out his open window "I'm having a fucking heart attack!" and continues to drive. Chief Bryant

turns around and activates his blue lights.  After Plaintiff fails to stop and goes through two stop signs, Chief Bryant also activates his siren.    Nevertheless,  at  the  next  stop  sign, Plaintiff turns left onto the highway and speeds away from Chief Bryant.  Chief Bryant pursues Plaintiff for another minute at high speed before Plaintiff pulls over.

Plaintiff immediately gets out of his car and quickly walks back to the passenger side of Chief Bryant's SUV.  Plaintiff gets into the SUV, exclaiming that he is "fucking dying" and that his "heart is about to explode."[3]  Chief Bryant walks around the front of the SUV to the passenger side.  Chief Bryant calls for the EMS at 3:29:40 a.m.

The audio reveals that Plaintiff is initially distressed and agitated, but Chief Bryant is able to calm Plaintiff down and assure him that the EMS has been called to their location.  While Plaintiff's exact words are largely imperceptible, Plaintiff calmly converses with Chief Bryant, who is standing outside the passenger side door while Plaintiff sits in the passenger seat.[4]

---

[3] It is undisputed that Plaintiff is holding a cigarette in his right hand and a 20-oz bottle of Mello Yello in his left hand. Once seated, Plaintiff yells to Chief Bryant, "Let's go, I'm fucking dying!" (Def. Bryant's Undisputed Facts, ¶¶ 17-18.)

[4]  It is undisputed that Chief Bryant is standing outside the SUV in a sloped ditch and chest high to the seated Plaintiff.  (Def. Smith's Undisputed Facts, ¶ 17.)

Chief Bryant keeps Plaintiff relatively calm while they wait for the ambulance.[5]  At 3:34:26 a.m., Chief Bryant can be heard stating, "This man is military too."  The parties believe that this is the point that Defendant Johnny L. Smith, a Deputy for Wheeler County, arrives on the scene.[6]

As their conversation continues, Chief Bryant points out to Plaintiff that he is conscious, alert, and able to tell him things, so he is going to be okay.  Plaintiff tells Chief Bryant he is falling apart.  They discuss Plaintiff's health.  At one point, Chief Bryant tells Plaintiff not to fall out onto him because he is not big enough to hold Plaintiff up there.

Ten minutes after the stop, Plaintiff becomes extremely agitated and begins ranting, crying, and cursing about his pounding heart and his back among other things.  At the time the ambulance arrives at 3:39:45 a.m., Plaintiff is raging, screaming, and

---

[5]  Whenever Plaintiff becomes agitated and begins cursing, Chief Bryant is able to calm him down.

[6] Just over a minute later, someone can be heard stating: "We are all here with you," reaffirming that Deputy Smith is on the scene. Moreover, according to the Law Enforcement Computer Aided Dispatch ("CAD") Systems Report, Deputy Smith arrived on scene at 3:34:41 a.m. (Doc. No. 49-3, at 5; see also Def. Bryant's Undisputed Facts, ¶ 27.)  The Court recognizes that Deputy Smith's testimony suggests that he arrived later than this, but Plaintiff himself testified that Deputy Smith was on the scene and standing with Chief Bryant at the passenger side of the SUV before the ambulance arrived. (Pl.'s Dep., Doc. No. 38-1, at 73-74.)

cursing.   In trying to calm him down, Chief Bryant calls Plaintiff "James," which sends him into a cursing tirade directed at Chief Bryant.   This tirade continues while the EMS personnel – one male and one female - approach Plaintiff on the side of the SUV. Plaintiff becomes more and more incensed that Chief Bryant "doesn't even fucking know him," which he says "breaks my fucking heart." During this time, Plaintiff's mother arrives and joins everyone on the passenger side of the SUV.   At this point, Plaintiff is fully enraged.[7]   His tirade against Chief Bryant lasts over two minutes as a female, presumably his mother, can be heard calling "Phillip" several times to calm him down.

The situation escalates very quickly.   Within two minutes of their arrival, the EMS personnel reappear in front of Chief Bryant's SUV, clearly standing back from the situation.   The female EMS grabs her partner's arm in response to the action occurring at the side of the vehicle.   Seconds later, there is an audible pop and someone repeatedly yelling "stay" – presumably Deputy Smith – who then commands "stay where you're at or I'll pop you again." Plaintiff can be heard groaning and yelling further away and out of the vehicle.   Plaintiff is then directed several times to roll over.   Plaintiff continuously screams that he is dying and having

---

[7] Again, the Court can only hear the audio but Plaintiff's rage is unmistakable.

a heart attack.   Plaintiff continues screaming and crying for several minutes, even after he is handcuffed.   He can be heard yelling that his rights are being violated and he will get a lawyer.   He then screams over and over to be taken out of his handcuffs:   "If you don't unhandcuff me, when I do get unhandcuffed, . . . I am going to fucking . . . ."

The first responders remain calm throughout this time, and a female, again presumably Plaintiff's mother, can clearly be heard trying to calm him down.   While Plaintiff claims to have no intention to hurt anyone a few minutes later, he continues his screaming and cursing.   Someone tells Plaintiff at 3:48:27 a.m. that if he calms down, he will go to the hospital, but if he does not, he is going to jail.   Plaintiff is placed back into Chief Bryant's SUV at approximately 3:55 a.m. - fifteen minutes after he is called "James."[8]   Plaintiff rants and raves uncontrollably throughout those fifteen minutes even though he had been tased and handcuffed.

Once he is placed in the vehicle, Plaintiff becomes quiet, but that lasts only momentarily.   Plaintiff tirades again.   He

---

[8]   Plaintiff testified that his agitation was caused in part by the EMS's refusal to take him to the hospital after accusing him of being on bath salts or some other drug.   (Pl.'s Dep. at 70-71, 75, 90.)   While this refusal may have occurred, the dash cam clearly reveals that Plaintiff's cursing tirade began before the EMS had an opportunity to speak to Plaintiff and in response to Chief Bryant calling him "James."

demands a cigarette from his mother.  He also demands to be taken to the Veterans Administration hospital.  He becomes agitated again.[9]  The female paramedic explains to him that the VA hospital is not open, and he has to go to the Dublin hospital.  The female paramedic tells Plaintiff that she is trying to help him, but he is "being so crazy and violent" that she cannot take him anywhere.  Plaintiff continually demands an attorney and a cigarette.  He continues to exclaim that he is having a heart attack and his body is falling apart.  Plaintiff then berates the male paramedic for wearing gloves.

When Chief Deputy Richie Floyd arrives on the scene, Plaintiff calms down considerably and for a few minutes.  At 4:18 a.m., the SUV leaves the scene to take Plaintiff to the hospital.  It is undisputed that Chief Deputy Floyd transported both Plaintiff and Chief Bryant, who complained of injuries to his back, neck and legs, to the Fairview Park Hospital in Dublin, Georgia.  (Def. Bryant's Undisputed Facts, ¶¶ 62-64.)  Deputy Smith did not have any further interaction with Plaintiff that night.

---

[9] "Agitated" is an understatement.  Plaintiff is screaming, crying, and cursing uncontrollably.  Banging within the SUV can be heard while Plaintiff is screaming.  This goes on for another 15 minutes, during which time Plaintiff refuses orders to put his legs back into the SUV.

Witness testimony, viewed in the light most favorable to Plaintiff, fills in the blanks of what transpired on the side of Chief Bryant's vehicle.  While Deputy Smith stood with Chief Bryant at the side of the SUV and listened to Plaintiff, Deputy Smith grabbed Chief Bryant's taser from his vest.  (Pl.'s Dep. at 75-76.)  Defendant Smith held the taser like he was "trying to hide it," according to Plaintiff.   (Id. at 76.)   At this point, Plaintiff's tirade came to a climax as he stood up on the floorboard of Chief Bryant's SUV with his left arm on the open door and his right arm on top of the vehicle.  (Id.)  Plaintiff testified that he was slipping and decided to "try to avoid the situation and jump over it."  (Id. at 77.)  When he tried to jump between the door and Chief Bryant, Chief Bryant reached up to grab Plaintiff.  (Id. at 78.)  Chief Bryant and Plaintiff fell down into the ditch on the side of the road. (Id. at 78-79.)  While Plaintiff was on his stomach on the ground, Deputy Smith deployed

the taser into his upper back.[10],[11] (See Pl.'s Dep. at 82; Pl.'s Decl., Doc. No. 50-3, ¶ 5 & Ex. A.)

    Returning to the dash cam, the SUV arrived at the hospital at 4:47:40 a.m. Conversation between Chief Bryant and presumably hospital personnel can be heard. Chief Bryant reports that Plaintiff has PTSD and thinks he is back in Iraq. The staff try to get Plaintiff out of the vehicle, but he demands a cigarette. Plaintiff becomes hysterical about his health again. He states: "I promise you I will not fight you guys. I'm telling you I have PTSD. All I need is a cigarette and I will gladly walk inside." Plaintiff continues to cry and scream while a hospital staff member tries to convince him to go inside. Plaintiff works himself into another tirade eight minutes later. A moment later, Plaintiff can be heard screaming as he is escorted into the hospital. There is no other relevant information on the dash cam after this point.

---

[10] Contrarily, and immaterially, Deputy Smith testified that he saw Plaintiff stand on the floorboard and strike down at Chief Bryant's head with the Mello Yello bottle, causing Chief Bryant to fall. He testified that as he came at Plaintiff, Plaintiff tripped and fell down into the ditch. Deputy Smith then grabbed the taser from Chief Bryant, who was lying on the ground, and tased Plaintiff as he tried to get off the ground. Deputy Smith managed to handcuff Plaintiff, but Plaintiff continued cussing and was non-compliant. (Smith Dep., Doc. No. 37-3, at 22-30.)

[11] It is disputed, though immaterial, whether both leads of the taser made contact with Plaintiff's back. (Compare Pl.'s Dep. at 82; Smith Dep. at 26, with Pl.'s Decl., Doc. No. 50-3, ¶ 5 & Ex. A.)

Once he was in the hospital, Chief Bryant removed Plaintiff's handcuffs at the request of the nurses.[12] (Def. Bryant's Undisputed Facts, ¶ 75.) Once the handcuffs were removed, Plaintiff asked to be released from the hospital so that he could seek treatment at a VA facility. (Id. ¶ 76.) As Plaintiff was leaving the hospital, a staff member handed him a clipboard and asked him to sign it for the services that were provided. (Id. ¶ 77.) Plaintiff threw the clipboard back on the counter, and one of the nurses said, "Oh, that was assault." (Id. ¶ 78.)

Plaintiff testified that as he was going out the front door of the hospital, he was tackled against a handrail by Defendant Clark Schrader, an officer with the Dublin Police Department. (Pl.'s Dep. at 103, 105.) Officer Schrader had been dispatched to the hospital at the request of an on-scene deputy who was assisting the hospital with security. (Schrader Decl., Doc. No. 43-1, ¶ 4.) Plaintiff agrees that Officer Schrader heard the nurse yelling, "That's assault, that's assault." (Pl.'s Dep. at 129.) But he points out that he had "two police officers" walking out with him so that if he had assaulted someone, they would have arrested him.

---

[12] The dash cam reveals that Chief Bryant's SUV, presumably driven by Chief Bryant, leaves the hospital at about 5:08 a.m. Chief Bryant had no other involvement with Plaintiff that night.

(Id. at 129-30.)  Upon his arrest, Officer Schrader took Plaintiff to the Laurens County Detention Center.[13]  (Schrader Decl. ¶ 12.)

Deputy Schrader contends that upon his arrival, he was advised that Plaintiff had assaulted a nurse.  (Schrader Decl. ¶ 5.) Officer Schrader heard Plaintiff yelling and cursing and observed Plaintiff leaving the hospital with a large group of nurses and the on-scene deputy following him.  (Id. ¶ 6.)  Officer Schrader determined that Plaintiff posed an immediate threat of danger to himself and others.  He attempted to arrest Plaintiff, but Plaintiff resisted.  (Id. ¶¶ 7 & 8.)  Officer Schrader took Plaintiff to the ground and handcuffed him.  (Id. ¶ 9.)

On March 8, 2022, Plaintiff filed the instant case asserting the deprivation of certain constitutional rights under 42 U.S.C. § 1983.  The Amended Complaint was filed on April 13, 2022.  (Doc. No. 15.)  In Count I, Plaintiff claims that Defendants Chief Bryant and Officer Schrader failed to provide Plaintiff with necessary medical care.  In Count II, Plaintiff claims that Defendants Chief Bryant and Officer Schrader falsely arrested him.  Count III is an

---

[13] At deposition, Plaintiff testified that Officer Schrader slapped him while he was being booked into the jail.  (Pl.'s Dep. at 107, 135.)  He then claimed that Officer Schrader took him to a little bathroom cell where other jailers jumped him while he was in handcuffs.  (Id. at 137.)  However, there are no factual allegations about this event in the Amended Complaint, the operative complaint (doc. no. 15), and therefore this deposition testimony is not relevant to any claim in the case.

excessive force claim against Defendants Deputy Smith and Officer Schrader.  Finally, Count IV is a failure to train claim against Defendant Tim Chatham, Chief of Police of the Dublin Police Department and Officer Schrader's supervisor.[14]

## II.   SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The purpose of the summary judgment rule is to dispose of unsupported claims or defenses, which, as a matter of law, raise no genuine issues of material fact suitable for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322—24 (1986).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party.  Id. at 252; accord Gilliard v.

---

[14] On June 22, 2022, the Court dismissed Defendant Randy Rigdon, Sheriff of Wheeler County and Deputy Smith's supervisor, who had also been named in Count IV of the Amended Complaint. (Doc. No. 23.)

Ga. Dep't of Corrs., 500 F. App'x 860, 863 (11th Cir. 2012) (per curiam). Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in its pleadings. Rather, [his] responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576—77 (11th Cir. 1990). As required, this Court will view the record evidence "in the light most favorable to the [nonmovant]," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will "draw all justifiable inferences in [Plaintiff's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*) (internal quotation marks omitted).

### III.   LEGAL ANALYSIS

Section 1983 creates a private right of action for the deprivation of federal rights by persons acting under color of state law.[15]   42 U.S.C. § 1983.   Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred . . . ." Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).

Through their motions for summary judgment, Defendants claim they are entitled to qualified immunity with respect to the federal

---

[15] Here, there is no dispute that Defendants were at all relevant times acting under color of state law.

claims asserted against them.  Qualified immunity is a judicially-created affirmative defense under which "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lumley v. City of Dade City, 327 F.3d 1186, 1194 (11th Cir. 2003) (citations omitted).  There is no dispute in this case that each Defendant was performing within the scope of his discretionary authority at all relevant times.  Accordingly, the burden shifts to Plaintiff to demonstrate that qualified immunity is not appropriate.  See Lumley, 327 F.3d at 1194.

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." Tolan v. Cotton, 572 U.S. 650, 655 (2014).  "The first [prong] asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." Id. at 655-56 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001) (alterations omitted)).  "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly

15

established' at the time of the violation." Id. at 656 (citing

Hope v. Pelzer, 536 U.S. 730, 739 (2002)). "Courts have discretion

to decide the order in which to engage these two prongs . . . [b]ut

under either prong, courts may not resolve genuine disputes of

fact in favor of the party seeking summary judgment." Id.

(citations omitted).   The Court will now consider each of the

alleged constitutional violations and the respective Defendant's

claim to qualified immunity.

## A. Excessive Force Claims

Under Count III of the Amended Complaint, Plaintiff complains

that Deputy Smith and Officer Schrader subjected Plaintiff to

excessive force at the roadside scene and at the hospital

respectively.

The Fourth Amendment to the United States Constitution

guarantees the right to be free from the use of excessive force

during an arrest.[16]  Saunders v. Duke, 766 F3d 1262, 1266-67 (11th

Cir. 2014).   This claim is evaluated under an objective

reasonableness standard, wherein the question is "whether the

officer's conduct is objectively reasonable in light of the facts

confronting the officer." Brooks v. Miller, 78 F.4th 1267, 1282

(11th Cir. 2023) (quoted source omitted).   The inquiry balances

---

[16] The propriety of Plaintiff's separate arrests will be discussed,
infra, as Plaintiff has claimed the arrests lacked probable cause.

"the 'nature and quality' of the acts on the individual against the government's justification for using force." Brooks, 78 F.4th at 1282 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).  The circumstances confronting the officer "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (cited sources omitted).  Moreover, because the standard is an objective one, the underlying intent or motivation of the officer is irrelevant.[17]  Id.

In viewing the evidence in the light most favorable to Plaintiff, Deputy Smith encountered a ranting and raving Plaintiff at the side of Chief Bryant's SUV on the night in question.  Despite their patient efforts, neither officer was able to calm Plaintiff down.  There can be no dispute that Plaintiff was hostile, irrational, bellicose, and dangerous at the climax of the events that led to Deputy Smith's tasing him.  In that state, Plaintiff leapt from the SUV.  No matter whether he was trying to jump between the vehicle door and Chief Bryant or directly upon Chief

---

[17]  For this reason, any evidence or argument that Deputy Smith had a "preconceived notion" (doc. no. 50, at 15) about Plaintiff's PTSD and how to deal with veterans with PTSD from a meeting six months earlier is irrelevant.

Bryant, Plaintiff caused Chief Bryant to fall.[18]  There was sudden

contact with Chief Bryant, an officer of the law.  Plaintiff was

not handcuffed, and he was uncontrollable.  From the perspective

of any reasonable officer witnessing this scene, Plaintiff posed

an immediate threat of harm to Chief Bryant.  The use of a taser

to gain control of a hostile, uncooperative, and potentially

violent suspect is reasonable under these circumstances.  See Drape

v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (approving the

single use of a taser against a non-compliant suspect at a traffic

stop who "used profanity, moved around and paced in agitation, and

repeatedly yelled at" the officer); Mobley v. Palm Beach Cnty.

Sheriff Dep't, 783 F.3d 1347, 1356 (11th Cir. 2015) (concluding the

use of a taser was not unreasonable to effectuate the arrest of a

suspect who was hostile and non-compliant).

    The Eleventh Circuit recently found the use of a taser

reasonable in Prosper v. Martin, 989 F.3d 1242 (11th Cir. 2021).

In the case, the officer encountered a suspect behaving

irrationally and erratically.  The Eleventh Circuit noted that

once the suspect struck the officer, "[i]t goes without saying .

---

[18]  Plaintiff's own testimony explains:  "[Deputy Smith] reached
over and grabbed Chief Bryant's taser off his vest, and I stood
up,  . . . and we were talking back and forth, . . ., [and] I
slipped . . . .  And so in that moment I was just like I'm going
to just jump.  And Chief Bryant put his arm up to try to catch me,
and he went down the hill with me, and then I got tased." (Pl.'s
Dep. at 75-76.)

. . that [the officer] was dealing with a man who was not only irrational, erratic, and unresponsive, but also violent." Id. at 1253. Accordingly, the Eleventh Circuit affirmed that the use of a taser to subdue a suspect who repeatedly ignores police instructions and continues to act belligerently toward police is objectively reasonable.[19]   Id. at 1254 (quoting Zivojinovich v. Barner, 252 F.3d 1059, 1073 (11th Cir. 2008)).

In this case, it goes without saying that once Plaintiff caused Chief Bryant to fall down the ditch with him, Deputy Smith's use of a taser to bring Plaintiff under control and to prevent further harm to Chief Bryant was objectively reasonable. In fact, the mere moments between the immediate tasing of Plaintiff and the handcuffing of Plaintiff demonstrate that Deputy Smith's use of the taser was highly effective to bring the situation to a quick conclusion.

In response, Plaintiff highlights disputes of fact related to when Deputy Smith arrived on the scene, when he grabbed the taser from Chief Bryant's vest, whether Plaintiff had a Mello Yello bottle in his hand, and whether both prongs of the taser contacted Plaintiff's back. These facts are irrelevant to whether Deputy Smith acted reasonably when he undisputedly witnessed an

---

[19] While the officer in Prosper initially used his taser, he ultimately had to resort to deadly force.

uncontrollable, irrational, hostile, and belligerent suspect jump down from an SUV and cause the fall of a fellow officer. No reasonable jury would find Deputy Smith's deployment of a taser to neutralize the threat posed by Plaintiff and to gain immediate control of the situation unreasonable. Thus, Deputy Smith's use of force was not excessive under the circumstances.

Plaintiff also challenges the use of force by Officer Schrader in effecting his arrest at the hospital. Plaintiff complains that Officer Schrader "pinned [him] against a handicap handrail and shoved [him] to the ground." (Am. Compl. ¶ 104.) It is undisputed that Plaintiff was still cursing and screaming when he arrived at the hospital. He did so when hospital staff tried to get him out of the SUV to receive medical care. He can be heard yelling as he entered the hospital. The on-scene deputy called local law enforcement because of Plaintiff's conduct. Once Officer Schrader arrived, it is undisputed that a nurse was yelling that Plaintiff had assaulted her.[20] Plaintiff's conduct would have caused apprehension of an immediate threat of harm to others. It is also undisputed that Plaintiff resisted the arrest. Accordingly, the fact that Officer Schrader laid hands on Plaintiff

---

[20] Whether Plaintiff actually assaulted a nurse is immaterial to what Officer Schrader understood the circumstances to be.

to effectuate an arrest and then threw him to the ground as he resisted is not unreasonable under the circumstances.

In conclusion, this is the kind of case the United States Supreme Court warned not to adjudge "in the peace of a judge's chambers." See Graham v. Connor, 490 U.S. 386, 396-97 (1989). Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id.   In light of the tense, highly agitated, and precarious circumstances Plaintiff presented to these officers, neither Deputy Smith nor Officer Schrader's use of force against Plaintiff in effecting his arrest on the roadside or at the hospital was unreasonable.   Both officials are therefore entitled to qualified immunity on his claims of excessive force.

**B.     False Arrest Claims**

In Count II of the Amended Complaint, Plaintiff claims that Chief Bryant and Officer Schrader arrested him without probable cause in violation of the Fourth Amendment.   Probable cause at the time of the arrest absolutely bars a § 1983 claim for false arrest. Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably

21

trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." Id. Importantly, an officer who effects an arrest without probable cause is still entitled to qualified immunity if he had "arguable" probable cause to arrest. Gates v. Khokhar, 884 F.3d 1290, 1298 (11th Cir. 2018).

With respect to Chief Bryant, he observed Plaintiff driving his vehicle even though Plaintiff suspected he was having a heart attack, which is a cause for concern for the safety of Plaintiff and other drivers. He then witnessed Plaintiff's speeding on a highway and refusing to stop for the emergency lights and siren. Thus, Chief Bryant had probable cause to stop Plaintiff based on the observed traffic violations and perception that Plaintiff was unfit to drive a vehicle. As the situation escalated during the stop, Plaintiff jumped from a standing position on Chief Bryant's SUV floorboard, making contact with Chief Bryant and causing him to fall. Ultimately, Plaintiff was charged with two counts of obstruction of an officer and fleeing or attempting to elude an officer in Wheeler County. The undisputed facts in this case support these charges; thus, Chief Bryant had at least arguable probable cause to arrest Plaintiff. Chief Bryant did not violate Plaintiff's Fourth Amendment rights.

22

Neither did Office Schrader.  The facts known to Officer Schrader at the time of arrest are that Plaintiff had been disruptive enough for the on-scene deputy to call for additional assistance and that Plaintiff had assaulted a nurse.  At the very least, the undisputed facts demonstrate that Officer Schrader had arguable probable cause to believe that Plaintiff had committed the offense of disorderly conduct.

Thus, both Chief Bryant and Officer Schrader had arguable probable cause to suggest Plaintiff had committed a crime.  For this reason, both are entitled to qualified immunity on Plaintiff's false arrest claims.

### C.   Deliberate Indifference Claims

Plaintiff claims that Chief Bryant and Officer Schrader violated his Fourteenth Amendment rights when they failed to provide him with necessary medical care.  To establish a claim of deliberate indifference to a serious medical need, a plaintiff must show (1) he had a serious medical need – the objective component; (2) the defendant acted with deliberate indifference to that need – the subjective component; and (3) his injury was caused by a defendant's wrongful conduct.  Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007).

Assuming that Plaintiff had a serious medical need, i.e., he was experiencing a heart issue, there is no evidence to support a

23

finding that either Chief Bryant or Officer Schrader acted with deliberate indifference to that need.  The subjective component of deliberate indifference requires a plaintiff to show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Hammonds v. Theakston, 833 F. App'x 295, 300 (11th Cir. 2020).

In this case, the facts establish that Chief Bryant immediately called for an ambulance to their roadside location. Once the ambulance arrived, it was Plaintiff's conduct that impeded his immediate medical care.  The dash cam shows that Plaintiff was obstructive and belligerent when the EMS personnel attempted to help him.  Even in Plaintiff's deposition, he admits that the EMS personnel thought he was on some type of drug based on his conduct. It was not long after the ambulance arrived that Plaintiff jumped down from the SUV and ended up handcuffed in a ditch.  Even then, Plaintiff's conduct hindered first responders from providing medical attention as he remained belligerent.  Plaintiff continued this behavior when he arrived at the hospital, bargaining with hospital staff for a cigarette rather than exiting the SUV to receive medical treatment.  The audio portion of the dash cam clearly reveals that it was Plaintiff's conduct that prevented his immediate medical care.  Certainly, there is no evidence that would

establish some purposeful or intentional denial of necessary medical treatment by Chief Bryant.

As for Officer Schrader, there is no evidence that he even knew Plaintiff had a serious medical need. When Officer Schrader arrived at the hospital, Plaintiff had already been discharged to seek treatment on his own accord. Plaintiff would have Officer Schrader held liable simply because once he was arrested, Plaintiff told the officer that he was having chest pains and wished to go to the VA hospital. An officer is not deliberately indifferent because he does not take a plaintiff's word that his chest hurts, especially when the plaintiff was just released from the hospital.

In sum, there is no evidence that either Chief Bryant or Officer Schrader was deliberately indifferent to a serious medical need. Moreover, Plaintiff has failed to present any evidence that he suffered an injury causally related to either Chief Bryant or Officer Schrader's failure to get him immediate medical attention. For these reasons, Plaintiff has failed to show a constitutional violation, and Chief Bryant and Officer Schrader are entitled to qualified immunity on Plaintiff's claims of deliberate indifference.

### D. Failure to Train Claim

In Count IV of the Amended Complaint, Plaintiff alleges that Defendant Tim Chatham, Chief of Police of the Dublin Police

Department, failed to properly train and supervise Officer Schrader. Because Officer Schrader did not violate any of Plaintiff's constitutional rights as a matter of law, there can be no liability for failure to train or supervise against Chief Chatham. Accordingly, Defendant Chatham is entitled to summary judgment on Plaintiff's claims against him.[21]

### IV.   CONCLUSION

Upon the foregoing, Defendant Johnny L. Smith's motion for summary judgment (doc. no. 37) is **GRANTED**. Defendants Bryant, Chatham, and Schrader's motion for summary judgment (doc. no. 40) is also **GRANTED**. The Clerk shall **ENTER JUDGMENT** against Plaintiff and in favor of all Defendants and **CLOSE** the case. Costs are taxed against Plaintiff.

**ORDER ENTERED** at Augusta, Georgia, this ___ day of November, 2023.

UNITED STATES DISTRICT JUDGE

---

[21] Because there are no viable claims against Defendant Chatham, the Rule 56(d) notice, Federal Rules of Civil Procedure, is **MOOT**.

26